Defendants violated Title VII, the Missouri Human Rights Act, and the Equal Protection Clause when they forced Officer Naes to transfer jobs and later failed to hire him because of his sexual orientation. I'll start with the Equal Protection Claim because the analysis is distinct from Naes' statutory claims in that the Equal Protection Clause is certainly not limited to remediating discrimination that causes adverse employment actions, as that phrase has been understood in this court. A state actor may not engage in intentional sex discrimination except in narrow circumstances that do not apply here. Of course, an Equal Protection Plaintiff must have suffered an Article III injury, but discriminatory job transfer decisions invariably involve Article III injuries, in fact. Turning to the statutory claims, defendants argue that even if this court accepts Naes' evidence of intentional discrimination, as the district court did, discriminatory transfers or transfer denials do not violate Title VII and the Missouri Human Rights Act. But these statutes prohibit intentional differential treatment in a term, condition, or privilege of employment, and a term, condition, or privilege of employment is a workplace benefit or requirement that an employer imposes on, grants to, or withholds from an employee. The when, where, and what of one's job is a term or condition of that job. So as the United States puts it, the job itself must be a term or condition of employment. So I mean, the big problem is Muldrow, right? So are you arguing that we can get around Muldrow or that it was, maybe you're arguing both, that it was wrongly decided and that it should be overturned, which obviously we can't do, but. Absolutely appreciate that this Court cannot overrule Muldrow, and we're not asking that this panel do that. Instead, it's our position that reversal is required, even in light of Muldrow, because the plaintiff there did not present the argument about the relevant statutory text or the constitutional text because, of course, no equal protection claim was that issue in Muldrow. That's pressed here. And moreover, Muldrow did not create a categorical rule that discriminatory transfers or transfer denials never constitute actionable discrimination. But the facts are so similar. I mean, when I look at, you know, I've got a chart here of, you know, salary remained the same. Muldrow, yes. Nays, yes. And just going down the line, the only kind of factual distinction I can find is the way the district court handled, in the two cases, the prestige of the position. And that, to me, seems insufficient to distinguish the case. But you're suggesting there were claims, different claims made here. Yes, Your Honor. Legal arguments. Different legal arguments. And I do want to get to some of the ways that we view Muldrow as distinguishable on the facts, but before I turn to that, I just want to emphasize that Muldrow doesn't engage with cases like Fisher or Goodwin. And to the extent it therefore creates an intra-circuit split with those cases, the earlier opinions control. So for example, in Goodwin, this is 729 F. 2nd 541, a plaintiff was transferred from a temporary hearing officer position to a permanent attorney position. The defendant argued that the employer had actually done the plaintiff a favor by transferring her into a permanent position. But this court held that the transfer was an adverse employment action. And that the plaintiff's, quote, preference could not be defeated by invidious discrimination. But turning to the ways that Muldrow is distinguishable from this case, I want to point to just a few examples. So one factual distinction is that the way defendants have argued this case is to say that the transfer decisions were based on deficient performance. Now we, of course, dispute that that was the motivation. And there's evidence in the record that the district court pointed to that demonstrates that that deficient performance reasoning was actually pretext. But it shows that even the defendants here must have viewed these employment decisions as adverse because they claim that the transfer effectively demoted my client. And Muldrow didn't involve a similar situation. Instead, it was a reorganization across the police department. The failure to transfer in this case was also argued as a failure to hire. And that's because Officer Ney is actually interviewed for the position and was denied that opportunity. And that's another way that this case is distinct from Muldrow, where the transfer denial was not treated as a failure to hire. And everyone agrees that a discriminatory failure to hire is actionable under Title VII, setting aside how the court interprets the phrased terms, conditions, or privileges of employment because the statute separately protects against discriminatory hires. On the question of prestige, the panel in Muldrow, as I understand it, was concerned that there was only the plaintiff's deposition testimony on that point. And of course, we would quibble that a plaintiff's testimony is not sufficient to create a genuine dispute of material fact. But here, we also have defendant's admission. And I'd point the court to 1373 of the appendix where the district court addresses this admission that in the detective role, Ney's got assignments directly from the chief of police. And that goes to that diminished prestige issue. And then as to the negative impacts on Ney's schedule, there's evidence that after the There was also an issue regarding the office. Like, didn't he have an office or there was an office in the headquarters here, but there wasn't that. And I don't know if that makes a big difference, but there was a difference there. Yes, that is another factual distinction, Your Honor. And I'd also point the court to Chief Judge Sutton's opinion in the three case in the Sixth Circuit. In that case, the court was writing as a panel, and the court was writing against this backdrop of adverse employment action precedent that's nearly identical to the precedent in this court. And instead of walking through every prior Sixth Circuit precedent to explain why the discriminatory shift assignment that was at issue in Threed was actionable while these prior precedents had found similar discriminatory shift assignments to be non-actionable, Chief Judge Sutton harmonizes the decision in Threed with the past precedent that's nearly identical to the precedent in this court by explaining that the test is context-specific and by beginning to retether the standard to the statutory text. Now to the extent Well, let me ask you this. So I know what the government's position is likely to be because they've ably briefed it, although I'm anxious to hear from them. What I think has happened is the terms, conditions, and pay, all that stuff, that that list of things in Title VII got, we tried to shorthand it. We tried to shorthand it as adverse employment action. And then adverse sort of took on a life of its own. Is that your reading of the precedent on how this sort of evolved? It just goes to show that maybe the best way is to go back to the actual statutory text, which is what we should have been doing in the first place. Yes, Your Honor. And I, again, would point the Court to the Threed discussion on this point, how through a game of telephone, this phrase terms, conditions, or privileges of employment has been transformed into the phrase adverse employment action, which has taken on a life of its own and returning to the statutory text. Well, my bet is that a lot of attorneys and judges, I think that Title VII probably actually says there must be an adverse employment action because it's become such a common thing over the last 40, 30 years anyhow. That's my understanding as well, Your Honor. And I would reserve the remainder of my time for rebuttal. Thank you. Thank you, Ms. Mack. Good morning, and may it please the Court. Anna Baldwin for the United States' amicus. As the Court is aware, just last year, the D.C. Circuit, sitting on bonk, overturned over two decades of precedent to hold that under the straightforward meaning of the statute, Title VII emphatically prohibits all discriminatory transfers and not just those that result in objectively tangible harm. What about transfers that actually improve conditions? Say you were a line worker and suddenly you become CEO, you make ten times as much money, you get a beautiful office. I mean, that's an extreme example. But is that, is that, would that be, would that be a problem in the government's view? So, I think the, you know, to break it down into the elements, it's the job position itself is the question of is it a term condition or privilege of employment? And so, clearly, whether it's you're becoming the CEO or a line worker, that's a term condition and privilege of employment. It's the question of, you know, discriminated against. The Supreme Court has said that is differential treatment that injures. And so, I think you would have to look at the specific facts. Does that, in fact, involve an Article III injury? You know, Judge Sutton talks about in III, is it a change in your terms, conditions and privileges that the plaintiff, in fact, sought out? So it, it isn't necessarily the case that every, you know, there might be some examples at the extremes that don't involve Article III injury. But in, you know, a Title VII case, a plaintiff is filing the case because they contend that they have been injured. They wanted a different kind of thing received. But here's the problem. You see, you see what the problem is. There has to be discrimination. We've been told that you have to prove it, or they can be proven circumstantially through McDonald Douglas. So we have to have a way to process these claims and figure out whether there's actually discrimination. If you have an instance where you're getting a substantially better job by every objective indicator, that sure doesn't look a lot like discrimination. It looks like you're actually benefiting from some action taken by your employer. And so they, I don't know that they're as discreet as the government makes them out to be. Certainly, we grant that, you know, again, the job position itself, it, is that a term condition and privilege? And the precedent has gone off as, you know, Judge Struss, yes, it's become this shorthand, it's judicial gloss, untethered from the statute. But we would definitely grant that there are circumstances where, are you going to have an easier time proving because of, the because of discrimination on a protected characteristic element when the job is worse? Yes. There will be, as a matter of ultimate proof before the jury, when you're being treated worse than, and not just merely differently, that that is going to be prohibited treatment. But that's not going to necessarily the core elements of the claim. And as a matter of, like, getting past summary judgment, have you pled the elements of the claim? But, but you see, that's the, that's the issue. The issue is in terms of processing. I think that would hap, what would happen in a case like that is it would probably get past summary judgment. Because you have alleged in the complaint that as a term or condition of employment has changed, even for the better. And therefore, the case goes forward and potentially gets to the jury. Am I, am I wrong about that? Again, I mean, it would have to be a job transfer that you didn't seek, that you didn't want. And that the fact that, you know, the allegation would be that it's on the basis of race or sex. The United States position is the injury requirement for Title VII doesn't come from the change in the terms, conditions, and privileges. The injury requirement comes from being subjected to intentional differential treatment on the basis of the statutory categories. And so that you are given, you know, a job that you don't want, maybe subjectively it's better, but it's on the basis of race, that is an injury. And that's an injury that's cognizable under the statute. You know, just, we understand that the, you know, court is sitting as a panel. You know, again, the D.C. Circuit Chambers began as a panel. The, just three weeks ago, the Fifth Circuit is reconsidering its ultimate employment decision rule, that it also has a significant immaterial harm standard that, again, in some of its decisions looks very similar to this Court. So regardless of whether there are other factual ways to resolve this question, it's such an important legal question that is repeated time and time again that the United States would join the plaintiffs in, you know, urging, could the Court do something similar to III, where Judge Sutton, you know, anchors the analysis and the text itself. The Court could do something similar to the initial panels in Hamilton and Chambers, where those panels urged the Court to go en banc. But the core point that the United States is here to make is that the adverse employment action analysis, there is no harm requirement just as to the terms, conditions, and privileges, and to urge this Court to reconsider that requirement as appropriate. Thank you, Your Honors. Thank you, Ms. Baldwin. Ms. Silsby. May it please the Court. The judgment of the district court should be affirmed for two reasons. First, because Appellant Lunez suffered no adverse employment action when he was transferred out of the nuisance unit into a patrol district and when he was denied a transfer back into the nuisance unit. Alternatively, this Court could affirm this decision on the alternate basis that Appellant Nays failed to show that he was transferred or denied a transfer because of his sex. He did not meet the elements of a prima facie case of sex discrimination, and even if he had, the appellees, City of St. Louis, Angela Koontz, and John Hayden, had legitimate nondiscriminatory reasons for transferring him and for not selecting him for the position that he applied for later. First, Nays suffered no adverse employment action when he was transferred. His new job that he was transferred to was in some respects different, but the differences were not harmful to him, and the differences did not create any materially significant disadvantage to him in his employment. Was it going to affect the hours or times of the week that he was able to work? It was not materially different because he worked in his old assignment. He worked overtime. He worked nights when he wanted to. He worked weekends. He could work holidays if he wanted to and earn overtime pay, which he did. The record shows that he did work overtime and worked nights and weekends when he wanted to. In his new position, he worked nights sometimes. He worked weekends sometimes. And he could have worked overtime to earn extra money, but he chose not to. The new position he was transferred to had the same rank in the St. Louis Police Department. Detective versus police officer is not, it's a distinction without a meaningful difference. There's no change in rank. It's just merely a working type. Does it have a prestige element? I do not believe so, Your Honor. And I don't think the record supports that it does. I know I'm going to be arguing a little bit against Muldrow and I sat on that panel and I'm wondering now, having read this case, whether or not we were right in Muldrow. But I'm going to ask the question anyways. If you were behind a desk doing administrative duties, dealing with the chief of police, and that's not this case, I understand that. And you get moved, you have this exact same rank, the exact same amount of And you're now walking a beat on the street and you manifestly do not want to walk a beat because you do not like that job at all. I wonder if that is enough of a change in the terms and conditions of employment that it should be actionable. I would say it is not, Your Honor. And that's because I don't think that Title VII obligates employers to provide employees with a job that they prefer. I think Title VII obligates employers not to discriminate against them in a way that harms them meaningfully. In the police department in particular, transfers from one position to another position, from one district to another district, from a specialized assignment to a non-specialized assignment are extremely routine. These happen constantly. Whenever there's a new chief, whenever there's some distinct need in the And so it's necessary for the police department to, in order to have the most efficiency and for the police commissioner to have the discretion to make those decisions as they best serve the department, for him to be able to do that without the risk of having to defend a Title VII claim every time there's a lateral transfer where the plaintiff or the employee suffers no material harm as a result. Well, and of course, that's the other side. You heard me ask the United States, I mean, we're going to get a flood of claims and if you end up every single transfer, every single change in the job that's a term or condition, you know, it's going to fundamentally change the way, I think, employers deal with employees. It would certainly fundamentally change the way the City of St. Louis handles transfers in the police department. Currently, under the existing rules, when an employee is being terminated or suspended or has some sort of action like that, that they're being deprived of or suffering some kind of discipline, there's an appeal right to the Civil Service Commission and those decisions often go to the law department for us to advise on. Transfers are not appealable to the Civil Service Commission and do not come to the law department for us to assess. So I think that shows that there's, that things like terminations, suspensions, written reprimands, those are things that are adverse employment actions that are adverse to the employee that potentially harm them. But something like a transfer where there's no loss of rank, there's no loss of income in terms of their salary or their biweekly rate, and all officers have the same opportunities to work overtime, those simply are not adverse employment actions that harm an employee and thus implicate Title VII. In addition, the transfer from the nuisance unit to his new assignment had very similar duties. There was not a significant change in duties. It's not as if he was supervising employees in the nuisance unit and now was just a, you know, rank and file officer. The duties were very similar in both jobs. They were investigating crimes, interviewing witnesses, preparing police reports, sort of the basic bread and butter of police work in the city of St. Louis. He testified in his deposition as to the schedule change that he just didn't prefer it. He's arguing at this point that, oh, it harmed his ability to, you know, meet his family obligations. All of that is speculative. If you look at the record in this case, he testified he just didn't prefer the new assignment. And our contention is that I just didn't like it is not sufficient to meet an adverse employment action or even to show Article III harm. Could I ask you one question? And I just want to press this, not on what you're talking about now, but it's been gnawing at me, which is the city of St. Louis on the sexual orientation claim is saying that Missouri, that that's actionable under Missouri law. But the Missouri Supreme Court said in, I think, 2019, pre-Bostock, that it is not actually against Minnesota law under the Missouri Human Rights Act. Are we bound by what you think? Because, I mean, ultimately our case law says, in a case like this one, we've got to look to the State Supreme Court. And if the State Supreme Court has told us something, we're bound by what the State Supreme Court says. And so, A, why did you make that concession in light of what the Supreme Court said? Why are we bound by it? Well, we made that concession. We never argued at any time that sex discrimination did not include sexual orientation discrimination. And I think that's just because it's a logically indefensible position. In order to discriminate against someone based on their sexual orientation, you necessarily must take into account that individual's sex, male or female. So we just think it's not a defensible position. So we didn't take it. And as to whether it's binding on the Court, I really think that the Bostock decision, being a United States Supreme Court case on pretty much identical logic, is that this Court can follow that decision, even with respect to the State law. Even for the Missouri claim? It just makes no sense, Your Honor, to not follow the Supreme Court precedent when it's so directly on point, I think. Okay. It does make me very nervous to not follow State law on a State law question, which is, I think, understandable. I don't want to say on the record that maybe the Missouri Supreme Court got it wrong, but I think the Bostock decision is controlling. Okay. I see I'm running down on my time here. I want to talk a little bit about my second point, which is that the appellant failed to show he was transferred or denied a transfer because of his sex. Now, as you know, this case was decided on summary judgment. So the parties had ample opportunity to conduct discovery, take depositions. And in our assertions of uncontroverted material fact, in fact number 92, the plaintiff be transferred out of the nuisance-slash-problem behavior unit because of his performance issues. And then we cite to Angela Kuntz's deposition. The appellant's response to that was response, admit that Kuntz requested Nays transfer out of the nuisance-slash-problem behavior unit because of serious deficiencies discovered in Nays' work during an audit of the unit, Exhibit 7. However, there was no audit of the unit but only a report on Nays. See paragraphs of C-6 response. If the summary judgment rule and the summary judgment process is to have any meaning whatsoever, when the plaintiff admits a fact like that, it has to have relevance in the court of appeals. He admitted that he was transferred because of serious deficiencies discovered in his work product. He affirmatively admitted that fact in response to our assertion of fact at the summary judgment stage. Now he's saying, oh, no, we contest that. Oh, no, we don't agree that he was transferred for deficiencies. But he already admitted that at the summary judgment stage, and that has to mean something. So our position is that as for the transfer out of the unit, he admitted specifically that the reason for that was his performance deficiencies. And so he cannot now say, oh, it was a Title VII sex discrimination action when I was transferred out because he's admitted that because of the serious deficiencies in his work, that's why he was transferred. But that helps you, I think, with the nondiscriminatory reason and pretext and maybe even with the parts of the prima facie case. But the other side made a good point, which is if he was transferred out because of performance issues, then perhaps it was an adverse employment action because it was viewed as a lesser job. In other words, he can't do his current job, which is too much, but he can do a lesser job. I don't think that the Department viewed it as a lesser job. The situation that was occurring was Angela Koonce was a new supervisor of the unit. She came in. She reviewed what was going on in the unit. And she didn't want this particular individual under her supervision because of these discovered issues. So she just wanted him out of her command, so she asked the police chief to transfer him elsewhere. I don't think that that really speaks to whether one job was better or worse. I think if the situation was such that she thought he wasn't competent at all, and if internal affairs had substantiated that, then he would have faced discipline for that, and that would have been an adverse employment action at that point. As to his attempt to seek a transfer back into the unit, later, about a year later, the position was posted. Employees were allowed to apply to it. And the process that the Department uses for these job postings is they post it on the internal website. All of the officers who are interested can apply. They fill out their paperwork and submit it. And then the Human Resources Division reviews that paperwork and decides who meets the minimum qualifications of this position. There was no evidence elicited by the appellant, Lunez, about who in Human Resources reviewed his application or the applications of the other two applicants. No evidence as to whether that person had some kind of discriminatory animus or why that person moved these three candidates forward in the process. So, essentially, there's sort of this vacuum of information there that the plaintiff, which is his burden to prove some level of discrimination, intentional discrimination within that part of the process. After the HR people determined that these were the three candidates that meet the MQs for the position, they forwarded them to the two individuals who are doing the interviews. Joe Calabro and Brent Feig, both male employees of the police department. They assumed that these three applicants met the minimum qualifications of the position, and based on their interview of these individuals, they determined that Nays was not the most qualified individual for that position. So, on that basis, they recommended to Angela Kuntz that this other individual, Officer Rebholtz, be selected, and then Chief Hayden approved that recommendation. And there's no evidence in the record whatsoever that Angela Kuntz or anyone else influenced that decision that was made by Brent Feig and Joe Calabro to choose Officer Rebholtz. And the district court, in its opinion, notes that when it's analyzing the retaliation claim, where it finds that the retaliation claim is meritless, it finds that there's no evidence that Angela Kuntz influenced that decision. But then the court makes this contradictory finding that despite that, there's somehow this evidence of intentional discrimination against Lou Nays because this less qualified individual was selected. But if you look at the record carefully, that is actually not supported by the record. So the evidence is that he was transferred out for legitimate reasons. He admitted that at the summary judgment stage. And then when he sought to be transferred back into that unit, that decision was made by two male officers, and it was made solely on the basis of merit. And Appellant Lou Nays failed to controvert those facts at the summary judgment stage. So I would ask that you please affirm the district court's ruling, either on the basis that Appellant suffered no adverse employment action, or on the alternative basis that he was not discriminated against by the appellees, City of St. Louis, Angela Kuntz, and John Hayden. Thank you, Your Honors. Thank you, Ms. Seals. Thank you. Defendants have offered no response to our equal protection analysis, and I want to start by pointing that out. Second, defendants have complained that our reading of the statute would mean that employers couldn't transfer employees. But employers can transfer employees for almost any reason, but they cannot do it when the motive is discrimination. And that's the question at issue here today. After Nays was forced to transfer out of the animal abuse investigator position, he could not have shown up the next day and performed the job he had because contrary terms and conditions were imposed by his employer. And the same is true when the department leader failed to hire him into the animal abuse investigator role. And for those reasons, we'd ask that the court reverse and remand. Thanks so much. Thank you, Ms. Smith. Thank you to all counsel who participated in the argument. We appreciate your help in the matter, and we'll take it under advisement.